# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **ALAN BROWN,**<br><br>    **Plaintiff,**<br><br>    **v.**<br><br>**ANTONIO BUSSONE,**<br>**ALLESANDRO VERRINI,**<br>**LIVE LOBSTER CO., INC.,**<br>**F/V DUCHESS II, INC.,**<br>**DECAPOD, INC.,**<br>**PERISHABLE PACKAGING, INC.,**<br>**CHARTER SEAFOOD, INC.,**<br>**ABABAV, INC.,**<br>**3156334 NOVA SCOTIA LIMITED (aka**<br>**CAPE BRETON LIVE LOBSTER CO.),**<br>**KENNEBUNK LOBSTER CO. LLC,**<br>**BAIT MAN CO. LLC,**<br>**STONINGTON REAL ESTATE LLC,**<br>**ATLANTIC LOBSTER CO. LLC,**<br>**BOSTON LOBSTER CO. LLC,**<br>**KNOX LOBSTER CO. LLC,**<br>**NEW ENGLAND LOBSTER CO. LLC,**<br>**PHIPPSBURG LOBSTER CO. LLC,**<br>**ROCKLAND LOBSTER CO. LLC, AND**<br>**LOBSTER WEB CO. LLC.**<br><br>    **Defendants.** | **CIVIL ACTION NO.** |

## VERIFIED COMPLAINT AND JURY DEMAND OF ALAN BROWN

### INTRODUCTION

1.      In or about September of 2003, the plaintiff Alan Brown (the ōPlaintiffö or

ōBrownö) commenced working as the General Manager of the Corporate Defendant Live Lobster

Company, Inc. (ōLive Lobsterö).   Brown managed Live Lobsterøs operations and, due to his

efforts, dramatically increased the fortunes of the company.  Working with company bankers, accountants and attorneys, Brown, who was a minority owner of Live Lobster, led efforts to establish sixteen additional companies and limited liability companies, all named as defendants herein.  The establishment of the sixteen additional companies were part of a business plan Brown developed with his former partner Antonio Bussone ("Bussone") and included as a partner Bussone's personal friend and business associate Alessandro Verrini ("Verrini").  Brown was a minority owner of all but three of defendant corporations – all of which were and are closely held corporations.  Through Brown's tenure the defendant corporations dramatically increased revenues and value.

In September 2009, Bussone terminated Brown's employment and took complete and unfettered control of all of the defendant companies.  He did this with the advice and approval of Verrini and without any business justification.  Bussone and Verrini have "frozen" Brown out of the closely-held companies.  They have, among other things,: refused to pay him compensation; refused to distribute profit and/or other revenue to Brown; refused to inform Brown regarding the payment certain tax liabilities of Brown as contractually required; refused to provide financial and corporate records to Brown; refused Brown's demand to purchase his interests in the seventeen corporations at a fair market value; and, refused to act to protect Brown from personal liability for corporate actions and debt.  Bussone has acted in a reckless manner, including defaulting on company loans thus putting Brown's interest in the companies and personal finances at risk.  Despite numerous demands, Bussone has refused to remedy his and Verrini's illegal actions.  Brown brings this action for breach of contract, promissory estoppel and breach of fiduciary duties and seeks equitable relief and money damages for the interests he lost and the damages he incurred as a result of the individual defendants' actions and omissions.

## PARTIES

2.      Plaintiff Alan Brown is an individual residing in, and a citizen of, the State of New Mexico.

3.      Antonio Bussone is an adult Massachusetts resident residing at 37 Central Street, Manchester-By-The-Sea, MA, 01944.

4.      Allesandro Verrini is an adult resident of Italy with a business address at Antonio Verrini & Figli, Piazza Cavour 2/2, 16128 Genova, Italy.

5.      Corporate Defendant Live Lobster Co., Inc. (õLive Lobsterö) is a Massachusetts corporation with a principal place of business at 5-11 Winnisimmet Street Chelsea, MA 02150-2620.  At all times relevant to this matter Brown was a minority shareholder in Live Lobster while Bussone and Verrini were the majority shareholders of Live Lobster.

6.      Corporate Defendant F/V Duchess II, Inc. (õDuchessö) is a Massachusetts corporation with a principal place of business at 5-11 Winnisimmet Street Chelsea, MA 02150-2620.  At all times relevant to this matter Brown was a majority shareholder in Duchess, owning 51% of the same, while Bussone was a minority shareholder of Duchess, owning 49% of the same.

7.      Corporate Defendant Decapod, Inc. (õDecapodö) is a Massachusetts corporation with a principal place of business at 5-11 Winnisimmet Street Chelsea, MA 02150-2620.  At all times relevant to this matter Brown and Bussone were 50% owners of Decapod.

8.      Corporate Defendant Perishable Packaging, Inc. (õPerishable Packagingö) is a Massachusetts corporation with a principal place of business at 580 Chelsea Street, East Boston, MA  02128.  At all times relevant to this matter Brown and Bussone were 50% owners of Perishable Packaging.

9.      Corporate Defendant Charter Seafood, Inc. (õCharterö) is a Massachusetts corporation with a principal place of business at 5-11 Winnisimmet Street Chelsea, MA 02150-2620.  At all times relevant to this matter Brown was a minority shareholder in Charter while Bussone and Verrini were the majority shareholders of Charter.

10.      Corporate Defendant ABABAV, Inc. (õABABAVö) is a Massachusetts corporation with a principal place of business at 5-11 Winnisimmet Street Chelsea, MA 02150-2620.  At all times relevant to this matter Brown was a minority shareholder in ABABAV while Bussone and Verrini were the majority shareholders of ABABAV.

11.      Corporate Defendant 3156334 Nova Scotia Limited (operating as Cape Breton Live Lobster Co.) (õCape Bretonö) is a Canadian corporation with a principal place of business at 2420 Main-A-Dieu Rd., Main-A-Dieu, NS, Canada, B1C 1X3.  At all times relevant to this matter Brown was a minority shareholder in Cape Breton while Bussone and Verrini were the majority shareholders of Cape Breton.

12.      Corporate Defendant Kennebunk Lobster Co. LLC (õKennebunkö) is a Maine corporation with a principal place of business at 5-11 Winnisimmet Street Chelsea, MA 02150-2620 and its registered agent located at Welte & Welte, P.A., 13 Wood Street, Camden, ME 04843.  At all times relevant to this matter Brown was a minority shareholder in Kennebunk while Bussone and Verrini were the majority shareholders of Kennebunk.

13.      Corporate Defendant Bait Man Co. LLC (õBait Manö) is a Maine corporation with a principal place of business at 5-11 Winnisimmet Street Chelsea, MA 02150-2620 and its registered agent located at Welte & Welte, P.A., 13 Wood Street, Camden, ME 04843.  At all times relevant to this matter Brown was a minority shareholder in Bait Man while Bussone and Verrini were the majority shareholders of Bait Man.

14.     Corporate Defendant Stonington Real Estate LLC (õStoningtonö) is a Maine corporation with a principal place of business at 5-11 Winnisimmet Street Chelsea, MA 02150-2620 and its registered agent located at Welte & Welte, P.A., 13 Wood Street, Camden, ME 04843.  At all times relevant to this matter Brown was a minority shareholder in Stonington while Bussone and Verrini were the majority shareholders of Stonington.

15.     Corporate Defendant Atlantic Lobster Co. LLC (õAtlantic Lobsterö) is a Maine corporation with a principal place of business at 5-11 Winnisimmet Street Chelsea, MA 02150-2620 and its registered agent located at Welte & Welte, P.A., 13 Wood Street, Camden, ME 04843.  At all times relevant to this matter Brown was a minority shareholder in Atlantic Lobster while Bussone and Verrini were the majority shareholders of Atlantic Lobster.

16.     Corporate Defendant Boston Lobster Co. LLC (õBoston Lobsterö) is a Maine corporation with a principal place of business at 5-11 Winnisimmet Street Chelsea, MA 02150-2620 and its registered agent located at Welte & Welte, P.A., 13 Wood Street, Camden, ME 04843.  At all times relevant to this matter Brown was a minority shareholder in Boston Lobster while Bussone and Verrini were the majority shareholders of Boston Lobster.

17.     Corporate Defendant Knox Lobster Co. LLC (õKnox Lobsterö) is a Maine corporation with a principal place of business at 5-11 Winnisimmet Street Chelsea, MA 02150-2620 and its registered agent located at Welte & Welte, P.A., 13 Wood Street, Camden, ME 04843.  At all times relevant to this matter Brown was a minority shareholder in Knox Lobster while Bussone and Verrini were the majority shareholders of Knox Lobster.

18.     Corporate Defendant New England Lobster Co. LLC (õNew England Lobsterö) is a Massachusetts corporation with a principal place of business at 235 East Main Street, Gloucester, MA  01930.  At all times relevant to this matter Brown was a minority shareholder in

New England Lobster while Bussone and Verrini were the majority shareholders of New England Lobster.

19.     Corporate Defendant Phippsburg Lobster Co. LLC (õPhippsburgö) is a Maine corporation with a principal place of business at 5-11 Winnisimmet Street Chelsea, MA 02150-2620 and its registered agent located at Welte & Welte, P.A., 13 Wood Street, Camden, ME 04843.  At all times relevant to this matter Brown was a minority shareholder in PLC while Bussone and Verrini were the majority shareholders of Phippsburg.

20.     Corporate Defendant Rockland Lobster Co. LLC (õRocklandö) is a Maine corporation with a principal place of business at 5-11 Winnisimmet Street Chelsea, MA 02150-2620 and its registered agent located at Welte & Welte, P.A., 13 Wood Street, Camden, ME 04843.  At all times relevant to this matter Brown was a minority shareholder in RLC while Bussone and Verrini were the majority shareholders of Rockland.

21.     Corporate Defendant Lobster Web Co. LLC (õLobster Webö) is a Maine corporation with a principal place of business at 5-11 Winnisimmet Street Chelsea, MA 02150-2620 and its registered agent located at Welte & Welte, P.A., 13 Wood Street, Camden, ME 04843.  At all times relevant to this matter Brown was a minority shareholder in LWC while Bussone and Verrini were the majority shareholders of Lobster Web.

## JURISDICTION AND VENUE

22.     This Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332 as the Parties have complete diversity of citizenship and the amount in controversy is in excess of $75.000.00.

23.     The action is properly in this district pursuant to 28 U.S.C. § 1391(b)(2) as a substantial portion of the injury, events and/or omissions giving rise to this controversy substantially occurred in this judicial district.

## FACTUAL BACKGROUND

### Brown Joins Live Lobster

24.     Defendant Bussone established Live Lobster in 2001.

25.     For the entirety of its existence, Live Lobster has primarily operated as a wholesale vendor of live lobsters, lobster meat and other lobster products.

26.     In or about 2001 Verrini, who is a close friend of Bussone, provided capital to Bussone for the purpose of establishing and operating Live Lobster.  In return, Bussone became a part owner of Live Lobster.

27.     Verrini is in the business of importing seafood products into Italy for distribution throughout Europe.

28.     Verrini has never been actively engaged in the day-to-day operations of Live Lobster or any of the defendant companies.  Rather, his role has been that of a silent partner.

29.     Verrini speaks limited English and has communicated almost exclusively with Bussone ó who is fluent in Italian and English -- regarding business matters.  Verrini has almost always followed Bussoneøs direction in business matters.

30.     In matters relating to the operations of the defendant businesses, Bussone and Verrini have acted in concert as a single block.

31.     Through his contacts in Europe, particularly with Verrini in Italy, Bussone had established Live Lobster as a small but growing lobster export company from 2001-2003.

32.     Bussone was talented and connected in sales but lacked operational experience.

33.     By the fall of 2003, Bussone was on the brink of exhaustion attempting to manage the business and realized that he could not manage the growing company without a dedicated and skilled operational manager.

34.     Bussone was on the verge of shuttering the business when he reached out to Alan Brown – a skilled and successful operations manager – in the fall of 2003.

35.     Brown agreed to become Live Lobster's General Manager but only if he were given a substantial ownership stake in the company.

36.     Bussone and Verrini agreed that Brown would become their partner in this venture.  The three decided that Verrini would own 40% of Live Lobster while Bussone and Brown would own 30% each.

37.     Brown executed an Employment Agreement on or about September 5, 2003 with Live Lobster, by which he agreed to become Live Lobster's General Manager effective September 29, 2003.  A true and accurate copy of the Employment Agreement and an addendum to the same is appended hereto as <u>Exhibit 1</u>.

38.     The Employment Agreement provided at paragraph 1 that

> for a period of six (6) months from the effective date, [Live Lobster] may
> terminate this contract and [Brown's] employment hereunder, without cause and at
> any time, upon fourteen (14) days written notice. . . . Thereafter, the Employment
> of [Brown] may be terminated by [Live Lobster] for cause (i.e. theft,
> embezzlement, insubordination, fraud, misrepresentation, or the like).

**Brown's Role in the Organization**

39.     From 2003 until Brown's illegal and without Cause termination in September 2009, Brown and Bussone shared management responsibilities of Live Lobster and its affiliates (collectively the "Companies").

40.     Brown primarily served the internal management needs of the Companies as their General Manager.  Brown managed the Companies' relationships with their lenders and banking partners, their accountants and their corporate and tax attorneys.

41.     Brown's skill in relationship building was particularly useful in resolving issues caused by Bussone's mismanagement of financial matters with the Companies' former lender – Citizens Bank -- and subsequently establishing a positive relationship with TD Bank.

42.     Bussone had caused three separate defaults with Citizens Bank, by: 1) purchasing West Bay Seafoods Ltd. in Canada without revealing or obtaining prior approval from Citizens Bank; 2) failing to submit required financial statements for 319 days after year end, and; disregarding a personal "clean down" requirement of Citizens Bank.

43.     In the wake of Bussone's default, Brown became much more active in managing the banking relationships of the Companies.  He transitioned the banking relationship to TD Bank and established and managed relationships with the company's new accounting firm and its new corporate and tax attorneys, DeFranceschi & Klemm, P.C.

44.     Brown was primarily responsible for securing a business loan with TD Bank, managing and directing all accounting and legal work leading to the closing of said loan.

45.     Brown led the efforts to purchase property in Stonington, Maine which would be owned by the corporate defendant Stonington.  Brown, in negotiating and consummating the Stonington deal, worked with five different lawyers in Massachusetts, Maine and Canada.  He directed and managed environmental reviews and the efforts of structural engineering and code enforcement consultants on behalf of Stonington.

46.     Brown also managed software transitions and instituted dramatic changes to the companies' insurance policies.  Bussone had comparatively limited interaction with the Companies' bank, accountants or attorneys during 2008 and 2009.

47.     During the 2008 global economic crisis, Brown worked to consummate a lucrative relationship with Darden Restaurants, Inc., the owner of the Red Lobster restaurant chain ("Darden").

48.     While Brown and Bussone had been working on developing a business relationship with Darden for some time, it was Brown alone who flew to Orlando in the fall of 2008 to negotiate the final pieces necessary to consummate the deal.

49.     Brown alone developed and established the Companies' protocol for doing business with Darden.

50.     During 2009 Bussone continued on a reckless path which had been held in check by Brown.  Bussone sold product and extended credit to high-risk customers.  Bussone tapped the TD Bank line of credit in the amount of $72,000 in September 2009 to purchase a vehicle, disregarding the requirements of the loan covenants requiring him to provide notice to TD Bank prior to making a purchase in excess of $50,000.  Bussone also intentionally delayed completion of the June 2009 Live Lobster Co., Inc. financial statements hoping for a favorable result for September, creating another event of default.

51.     As indicated above, Brown was the primary contact for Live Lobster's banking and other financial partners and several company credit cards were issued by using Mr. Brown's social security number.

**Expansion of the Venture and Establishment of the Affiliated Companies**

52.     Shortly after Brown commenced his employment with Live Lobster, he and Mr. Bussone decided to systematically create various affiliated entities to minimize tax and legal exposure as well as to compartmentalize the various aspects of their growing business.

53.     Live Lobster started in 2001 as a single Massachusetts "C" corporation.  The company was tax reporting on a cash basis until filing for a change to accrual in 2006.

54.     Upon consulting with a tax lawyer and the corporate CPA in 2006, Brown and Bussone decided to change the structure of the business.

55.     They decided to create new limited liability companies for the separate operations or prospective operations of their venture for the following reasons:

a. Taxes – Income taxes became due on the earnings in the "C" corporation prior to filing for the change from cash to accrual.  These taxes were divided into 4 equal payments over the next 4 years.  By compartmentalizing each of the profit centers into separate Limited Liability Companies, Live Lobster Co., Inc. could be operated at a loss until the taxes due by that "C" corporation were consumed by losses.  By design, the limited liability companies directly sourced and sold the raw material to Live Lobster Co., Inc. and the profits would be taxed as ordinary income to the partners/members of the limited liability companies – Brown, Bussone and Verrini.  For this reason, the limited liability companies were intended to have regular operating profits and the additional profits used to sustain the loss for the "C" corporation, Live Lobster.

b. Asset Protection – All new and significant assets would be held by separate legal entities, protecting them from attack from creditors and lawsuits.

c. Profit Centers – Each Company could now be judged on its own performance and management could be rewarded based on performance.  Non-performing units could be closed or sold.  Legal liability was also limited.

d. Competition – Setting up separate entities in different geographic areas kept competitors for raw material unsure of whom they were competing with, as Brown and Bussone were able to conceal their identities behind the venture.  This strategy allowed Brown and Bussone to pay different prices for raw material without being held to a common standard, as was the competition.

e.  Profit From Sales -- This strategy also worked for quoting customers, as buyers will secure what they believe to be competitive quotes from several different companies when in fact they may be speaking to the same venture.  Brown and Bussone could then have better control of sales prices and gross profit margins.

56.     Because Brown was the organizational leader of the venture and had developed a close working relationship with accountants and lawyers, Bussone and Brown decided that Brown would direct the effort to create the affiliated Companies.

57.     In February 2006, Bussone and Brown incorporated Duchess for the purpose of owning and operating a vessel.  Because Bussone was not yet a United States citizen, it was decided that Mr. Brown would own 51% of Duchess and Bussone would own 49% of Duchess.

58.     In or about May of 2006 Bussone and Brown incorporated Charter.  Through Charter, Bussone and Brown split off that aspect of their business used primarily for buying and selling bait in Rockland, ME.  Brown owns 33.3% of Charter and Bussone and Verrini own 66.7% of Charter.

59.     In or about June of 2006 Bussone and Brown incorporated 3156334 Nova Scotia Limited (operating as Cape Breton Live Lobster).  Cape Breton is the operating company running a buying station in Sydney, Nova Scotia, Canada and owns the licenses to purchase lobsters in Nova Scotia.  Brown and Bussone own 50% each of Cape Breton.  Cape Breton was established through Brown's efforts after yet another reckless business act by Bussone.

60.     During 2006 Bussone transferred approximately $170,000 in Live Lobster funds to a company in Cape Breton, Nova Scotia, Canada for the advance purchase of lobsters.  Bussone did so without performing adequate due diligence regarding the financial condition of that company.  That company was, at the time of the transaction, on the verge of bankruptcy and defaulted on both its shipment to Live Lobster and the advanced funds.

61.     Brown immediately flew to Nova Scotia and worked with local authorities and counsel to salvage as much value from the defaulted company as was possible.  As a result of Brown's efforts, the Companies purchased real property, buildings and a wharf in Main-a-Dieu which is now owned by ABABAV, a company which Brown established with counsel.

62.     On or about June 2, 2008, Bussone and Brown incorporated Boston Lobster Co., LLC; Knox Lobster Co., LLC; Phippsburg Lobster Co., LLC; Rockland Lobster Co., LLC; and, Atlantic Lobster Co., LLC as Maine Limited Liability Companies.  These Maine companies are used as operating companies to, among other things, buy product, lease smack boats including vessels owned by F/V Duchess II, Inc. in Maine or from town owned wharfs in Maine.  Brown owns 33.3% of these LLCs and Bussone and Verrini own 66.7% of these LLCs.

63.     On or about June 9, 2008, Bussone and Brown incorporated New England Lobster Co., LLC as a Massachusetts Limited Liability Corporation.  This company is used as an operating company to buy product from a privately-owned, leased waterfront facility in or around Gloucester, Massachusetts.  Brown owns 33.3% of New England and Bussone and Verrini own 66.7% of New England.

64.     On or about June 18, 2008, Bussone and Brown incorporated Kennebunk Lobster Co., LLC as a Maine Limited Liability Company.  Kennebunk owns an approved export license to Europe and also bids and sells product to wholesale customers in the United States.  Brown owns 33.3% of Kennebunk and Bussone and Verrini own 66.7% of Kennebunk.

65.     In or about October of 2008 Bussone and Brown incorporated Decapod. Decapod is a Massachusetts "S" Corporation which owns 100% of the plant, property, equipment and ownership rights of West Bay Seafoods, Ltd., a Canadian lobster operation in Clarkes Harbour, Nova Scotia, Canada.  Brown and Bussone each own 50% of Decapod.

66.     In or about December of 2008 Bussone and Brown incorporated Perishable Packaging. Perishable Packaging is a Massachusetts Limited Liability Corporation which operates two facilities in East Boston and Chelsea, MA for the production of gel packs, boxes and other packaging materials for sale in the seafood industry. Brown and Bussone each own 50% of Perishable Packaging.

67.     In or about April of 2009 Bussone and Brown incorporated Lobster Web Co. LLC. Lobster Web is a Maine Limited Liability Corporation which leases space from Stonington for the purpose of operating a lobster buying station as well as leasing and/or operating smack boats. Brown owns 33.3% of Lobster Web and Bussone and Verrini own 66.7% of Lobster Web.

68.     In or about April of 2009 Bussone and Brown incorporated Stonington Real Estate, LLC and Bait Man Co., LLC.

69.     Stonington is a holding company that owns real estate in Stonington, ME. The oceanside facility was purchased in June of 2008 for $2,050,000 and has a mortgage of approximately $1,700,000. The property has been greatly rehabilitated and improved and, upon information and belief, has a current market value of approximately $3,000,000. Brown owns 33.3% of Stonington and Bussone and Verrini own 66.7% of Stonington.

70.     Bait Man is a Maine Limited Liability Corporation which operates a bait operation on the property owned by Stonington Real Estate LLC in Stonington, ME. Brown owns 33.3% of Bait Man and Bussone and Verrini own 66.7% of Bait Man.

71.     The aforementioned seventeen Companies own four vessels, real property in West Bay, Stonington and Phippsburg, a tank house in Stonington, various buildings as well as product, several vehicles and substantial seafood industry equipment.

72.     Brown did not have an employment agreement with any of the seventeen Companies other than Live Lobster.  Brown was, however, a party to operating agreements governing the activities of the partners to the ventures.

73.     At the time of his 2009 termination Brown served as the General Manager of all of the Companies and corporate Treasurer to Live Lobster, Decapod, Charter, and ABABAV as well as the President of Duchess.

## Spectacular Growth of Live Lobster and Establishment and Growth of Affiliates

74.     From the time Brown commenced employment with Live Lobster in 2003 until the time of his illegal termination, the venture has enjoyed tremendous growth and success.

75.     In 2001, when Bussone and Verrini started Live Lobster, the company was little more than a lobster exporter to Italy.

76.     During 2003, upon information and belief, Live Lobster had less than $18,000,000 in sales, 90% of which were to Europe.

77.     When Brown joined the venture, he and Bussone identified its weakness -- securing a dependable supply of raw material for distribution.  The raw materials, lobster and lobster products, exist only in the cold North Atlantic waters of the United States and Canada.

78.     Brown and Bussone conceived of a plan to provide direct control at the source in the major areas of production (Massachusetts, Maine and Nova Scotia) by creating a network of venture-owned and operated buying stations.  Brown executed this plan.

79.     While Bussone continued to market the venture, expanding the European market, Brown worked closely with the Companies' bankers, lawyers and accountants to create the sixteen additional entities necessary to carry out their vision.

80.     Brown also personally loaned Verrini $15,000 to fund his investment in the new entities – which has never been paid back to Brown.

81.     Brown acted as the operational head of all seventeen Companies involved in the venture and he oversaw the procurement of capital, equipment, necessary permits and licenses as well as the raw materials necessary to create the venture's network.  He then acted as the day-to-day operational head of the venture.

82.     Brown also managed tax planning issues for the venture.

83.     Verrini has never been actively involved in the management or operations of any of the Companies.  He demanded, in 2008, full repayment of his initial loan to Live Lobster, which was made as consideration for his ownership interests in the Companies.  Verrini demanded substantial interest as well as a substantial gain on the exchange from United States dollars to Euro.  Verrini was paid in full.

84.     Despite his ownership interest and his being fully reimbursed for his capital contribution to Live Lobster, Verrini has not personally guaranteed any of the obligations of the Companies.  Verrini therefore, enjoys the benefits of ownership without any of the financial risk to which Brown is exposed.

85.     As indicated above, after Bussone badly botched the Companies' relationship with its prior lender, Brown stepped in and managed to create a strong relationship with TD Bank.

86.     TD Bank, for the past several years, has been the Companies' primary lender and Brown has personally guaranteed over $6,000,000 of the Companies' corporate debt.

87.     Under Brown's guidance the Companies enjoyed steady revenue and asset growth and a consistent level of net operating profit.  He helped ground Bussone, who tended to forge

ahead with little regard to long-term consequences or business risk.  Under Brown's guidance, the Companies steered clear of high risk while maintaining strong profit.

88.    Under Brown's guidance, the Companies and their owners avoided high tax liability.

89.    Brown's value to the Companies is evidenced by the explosive revenue growth the Venture has enjoyed since 2003.

90.    In calendar year 2004 the venture had net sales of $19,374,479; In calendar year 2005 the venture had net sales of $22,425,525; In calendar year 2006 the venture had net sales of $31,141,066; In calendar year 2007 the venture had net sales of $43,371,994; In calendar year 2008 the venture had net sales of $46,732,729.

91.    At the time of Brown's illegal termination, the venture operated direct buying stations in twelve locations over 600 miles of New England and Canadian coast.

92.    The Companies' sourcing strategy executed by Brown supplied a balanced market distribution of more than eight million pounds of live lobster and lobster products annually.

93.    Approximately fifty percent of product shipped by the Companies in 2008-09 was exported to Europe and twenty-five percent to Canada and to the United States.

**Status of the Venture at the Time of Brown's Illegal Termination and the Dictates of the Operating Agreements**

94.    Each of the Companies maintained separate financial books on a single computer server (in Boston) that is continuously updated with every purchase and sale.  Brown conceived, implemented and maintained this management information system.  The system allowed the Companies' management, located in Boston, to access immediate financial information on any of the Companies at any time, monitoring the performance of all locations.

95.     Although each entity maintained separate financial books, all quarterly and annual financial reporting was conducted on a consolidated basis.

96.     TD Bank also required consolidated reporting and it held as security for its business loan, the rights to all assets of the Companies as well as the personal guaranties of Brown and Bussone.  Verrini never provided a personal guaranty to TD Bank.

97.      Brown served as the General Manager of all seventeen Companies.  He had an employment agreement with Live Lobster but no employment agreement with any of the other sixteen Companies he managed.

98.     Brown was party, however, to operating agreements governing many of the sixteen entities.  Brown has obtained Operating Agreements of the following eleven Limited Liability Companies: Boston Lobster, Kennebunk Lobster, Atlantic Lobster, Knox Lobster, Phippsburg Lobster, Rockland Lobster, Lobster Web, Stonington Real Estate, Bait Man, Perishable Packaging and New England Lobster.  These Operating Agreements are appended hereto as Exhibit 2.

99.     Despite numerous requests made by Brown or his counsel, Bussone has refused to produce copies of the Operating Agreements or other operating documents relating to Decapod, ABABAV, Charter and Duchess.

100.    The Operating Agreements governing Boston Lobster, Kennebunk Lobster, Atlantic Lobster, Knox Lobster, Phippsburg Lobster, Rockland Lobster, Lobster Web, Stonington Real Estate, Bait Man, Perishable Packaging and New England Lobster are essentially identical except for the names and agreement dates.

101.    The Operating Agreements of each of these entities provide at Section 4.2(b) that the LLC shall

pay the tax liability of the member's distributive share of income of the Company no later than seventy-five (75) days after the end of the taxable year unless otherwise determined by the affirmative vote of Members holding a majority of the percentages then held by Members.

102.    The Operating Agreements of each of these entities provide at Section 4.4(c) that the LLC shall distribute Capital Proceeds, after certain payments and deductions and after accounting for adjustments to capital accounts, "to the Members in proportion to their [ownership] Percentages."

103.    The Operating Agreements also require that each Member "shall devote such time to the business and affairs of the Company as is necessary to carry out the Member's duties set forth in this Agreement.

104.    The Operating Agreements provide that complete and accurate books and records of the Company must be maintained and must be made available to its members.

105.    The Operating Agreements require, at section 8.4, that each Company issue to each Member "a complete accounting of the affairs of the Company for the taxable year then ended" within seventy-five days of the end of the taxable year.  The tax year for each of the Companies is the calendar year.

106.    During the course of 2008 the Venture paid Bussone's tax liability of $80,423, Brown's tax liability of $45,417 and Verrini's tax liability of $67,278.

107.    The practice of Brown, Bussone and Verrini was to make additional distributions to the Members to "equalize" the tax benefit received by the Member with the highest tax burden – usually Bussone.  In 2008 Brown received a tax equalization distribution of $35,006 and, upon information and belief, Verrini received a tax equalization distribution of $13,145.

108.    Just prior to Brown's wrongful termination, the Companies' accountants estimated that the tax payments made by the venture to pay the tax liabilities of the members for calendar year 2009 would be $117,620 for Bussone, $97,680 for Brown and $67,192 for Verrini.  The accountants estimated that the tax equalization payments for calendar year 2009 would be $19,680 for Brown and $50,428 for Verrini.

**The Illegal Termination of Brown**

109.    Bussone and a corporate attorney named Christopher Marino of the firm Davis, Malm & D'Agostine P.C. terminated Brown without notice or cause on September 21, 2009.

110.    Upon information and belief, Bussone acted with the prior approval and on behalf of Verrini.

111.    On September 21, 2009 at the Boston workplace from which Brown managed all seventeen Companies, Attorney Marino handed Brown the termination letter attached hereto as Exhibit 3 along with his business card, a Live Lobster check and unemployment information.

112.    Attorney Marino and Bussone then forced Brown to turn over his keys and directed Brown to leave the business and not to return.

113.    Marino and Bussone made clear that Brown was being terminated without Cause not only from Live Lobster, but from the other sixteen Companies.

114.    Bussone and Verrini had no right or authority to terminate Brown from Live Lobster without Cause, pursuant to the Employment Agreement between Brown and Live Lobster.

115.    Bussone and Verrini had no authority to terminate Brown as the General Manager of the other sixteen Companies.

116.    The termination was a shock to Brown as Bussone had not raised any serious issues he had with Brown as a partner, a corporate officer or General Manager.

117.    Bussone was motivated in large part by his desire to wrongfully retain payments that would otherwise be issued to Brown.

118.    Bussone was also motivated by his desire to take over the complete management of the Companies that Brown had a substantial hand in building.  By taking over the Companies and ousting Brown, Bussone was free to use, or misuse company assets as he saw fit – including in a negligent and reckless manner.  This included moving forward with a high risk acquisition of a Maine competitor called Atwood Lobster Company (õAtwoodö) with which acquisition Bussone intended to proceed without requisite approval from TD Bank.

119.    Brown, until his termination by Bussone, opposed the acquisition believing any such acquisition to be financially reckless and a threat to the very existence of the Companies.

120.    Atwood is a key competitor of the Companies.  According to its website, Atwood owns the largest shipping facility in Maine, has contracts with over seventy vessels in Maine and significant relationships with other Maine and Canadian lobster businesses.

121.    Atwood competes for many of the same clients as the Companies, including clients throughout Western Europe.  According to its website, Atwood is a major competitor for the provision of lobster to the õRed Lobsterö restaurants, a major account for the Companies.  Atwood has shipped upwards of 300,000 pounds of lobster to Red Lobster per month.

122.    With Brown out of the way, Bussone proceeded with his attempt to purchase Atwood.  TD Bank, however, refused to fund the acquisition (which would have required a substantial outlay of credit for which Brown would be responsible).

123.     Despite the rejection by TD Bank, Bussone has recklessly forged ahead.  Bussone informed Brown, through his attorney, that he "would like to call a meeting of the shareholders to see if the shareholders want to individually participate in [the Atwood] transaction either through a new venture or through additional capital contributions.  In the event the company and its shareholders reject the offer to participate, Mr. Bussone will likely explore the opportunity individually."

124.     This purported "shareholder meeting" is nothing more than a sham designed to cloak Bussone's recklessness and failure to abide by his fiduciary responsibilities with the air of corporate legitimacy.

125.     In fact, Bussone had never before called a shareholder meeting and the company had never before adhered to such corporate formalities.

126.     Brown, by way of a correspondence from his attorneys dated June 11, 2010 and appended hereto as <u>Exhibit 4</u>, requested specific information from Bussone before such a "meeting" was called.  He also specifically informed Bussone's counsel:

> Mr. Bussone has a fiduciary responsibility to give his full time and attention to the Companies and to act only in the best interests of the Companies and their shareholders.  Mr. Bussone is prohibited from taking any action – regardless of Mr. Verrini's assent -- that could possibly detract from the value of the existing Companies.  He cannot utilize any asset of the Companies, moreover, to pursue his own interest in an Atwood purchase, again regardless of Mr. Verrini's assent.  He also cannot leverage or otherwise utilize his relationships with any of the Companies' clients, vendors, venturers or any other person or entity with which the Companies enjoy an advantageous business relationship for the purpose of pursuing an interest in Atwood.  Finally, Mr. Bussone is strictly prohibited from engaging in any conduct which is directly or indirectly competitive with the Companies, regardless of Mr. Verrini's assent, which renders his direct or indirect ownership of Atwood a practical and legal impossibility.

127.     Bussone remained undeterred and has scheduled a sham shareholder's meeting for July 7, 2010.

128.    With Brown out of the way, Bussone could continue a pattern and practice of other unethical and/or illegal practices including:

a.  Ordering employees to conceal evidence in an international investigation into the activities of Bussone's family members;

b.  Following through on a plan conceived with Verrini to repay Verrini's initial loan to Live Lobster through reduced declared values of product shipped to Italy, thereby wrongfully reducing the duties and taxes paid to the Italian government;

c.  Concealing the nature of Brown's termination from TD Bank to avoid an event of default;

d.  Creating a false Note to evidence an otherwise non-existent and unsupportable "debt" from Live Lobster to Bussone and Verrini in the amount of $1,493,726;

e.  Continuing to leverage the Companies – and Brown's risk – without Brown's consent;

f.  Failing to pay estimated quarterly taxes for each LLC Member, based on prior year earnings, as required by the State of Maine subjecting the other members to penalties and interest.

129.    Bussone's termination of Brown was made without the prior approval of TD Bank and violated loan covenants, which required prior approval before a management change.

130.    On September 29, 2009, Brown issued to Bussone a correspondence, appended hereto as Exhibit 5, in which he protested his termination and pointed out the illegal action taken by Bussone.  In that correspondence, Brown informed Bussone:

You may not terminate my employment where my participation in the business and my drawing of income from my employment is the only means by which I can protect my substantial, but minority, investment and ownership rights in the company.  Moreover, you and your attorneys have apparently not considered that your purported termination of me constitutes an "Event of Default" under the various Commercial Loan Agreements we have.  Specifically, any change in our management, which my termination would be, or in the condition or affairs of the company, which my termination also would be, constitute a default under clauses 7.13 and 7.17 of our commercial loan agreements, exposing us both to substantial personal financial risk.

131.   Brown attempted to persuade Bussone to retract the termination, in large part, because of complex and precarious state of the company and industry.

132.   Brown offered to walk away from the venture if Bussone so desired but in an orderly fashion which would allow for a smooth transition and provide for Bussone and Verrini to buy Brown's interest in an equitable manner and release Brown from financial obligations and guaranties of the Companies.  Brown informed Bussone as follows:

> If you do not see value in our continuing relationship, I respect your decision and will gladly withdraw from my involvement *in an orderly and financially responsible manner*.  If you are prepared to have our assets valued, pay me in full my fair share of those assets and have all my personal guarantees removed from the indebtedness of the companies, which will undoubtedly take months, I will happily walk away. In the interim period I *must* be returned to my position.  If it makes matters easier for you we can tell our employees that I have returned as a company consultant.
>
> If you are unable to compensate me for the value of my assets and cannot secure the release of my personal guarantees, then *you must retract* your letter of termination as well as your communication with employees, customers, vendors and any others to stop the significant erosion of our company's (and my) reputation which will impact our ability to obtain maximum return on our investments.

133.   Bussone refused Brown's request.  He responded through his attorney that Brown would be invited to attend "sharholders meetings" to protect his interests but that, other than severance pay, Brown would receive no further compensation, disbursement or purchase of interest from any of the Companies.

134.   As indicated above, throughout the course of Brown's relationship with Bussone, the Companies had ignored certain corporate formalities.  Neither Live Lobster nor any of the other Companies have held a shareholders' meeting.  No member votes were ever taken to determine significant corporate actions.  It was understood that Bussone and Verrini were a controlling bloc.

135.    On or about October 14, 2009, Brown, though his attorneys, issued a demand letter specifically informing Bussone that he and Verrini had engaged in an illegal freeze-out of Brown from the Companies he had helped to build.  That correspondence is appended hereto as Exhibit 6.

136.    Brown's counsel specifically informed Bussone's counsel that Bussone had breached his fiduciary duty to Brown and specifically that:

> In severing the employment of a minority shareholder who has no other means but his management role in the company to protect his interests and earn income, the corporate actors must not only demonstrate that there was a legitimate business purpose behind the action but also that "the same legitimate objective could not have been achieved through an alternative course of action."  In the matter at hand, Mr. Brown suggested to Mr. Bussone some two weeks ago, and I suggested to you during our conversation last week, that Mr. Brown be returned to his position and that he be allowed to continue to guide the company during this perilous period until a purchase of his interest could be arranged and an orderly transition achieved.  Mr. Bussone, of course, has rejected this reasonable alternative.

137.    Bussone again rejected Brown's suggestion that he be allowed to return to the workplace.

138.    Bussone and Verrini have refused to allow Brown back into the workplace.

139.    Bussone and Verrini have refused to provide Brown with any distributions or compensation, other than twelve weeks of severance pay, while they have continued to enjoy substantial compensation from the Companies.

140.    Bussone and Verrini have refused to pay Brown's tax liability while they, upon information and belief, continued to enjoy the payment of their tax liabilities through the Companies.

141.    The Companies have never issued a dividend to shareholders and the only remuneration received by Brown was direct compensation and tax reimbursement.  Brown is now

cut off from the only sources of revenue he ever derived from his investment and ownership

interests in the Companies.

142.    Brown believes that the Companies have an aggregate value of between $7 million

and $10 million.  The Companies are all close corporations in a large-scale venture.  As such, the

Companies cannot be sold individually and there is a limited market for Brown's shares outside of

Bussone and Verrini.

**Count I**
**Breach of Contract**
**Live Lobster -- Compensation**

143.    Brown restates and incorporates herein by reference paragraphs 1 through 142.

144.    Brown executed a contract with Live Lobster, <u>Exhibit 1</u>, on or about September 5,

2003 by which he agreed to become Live Lobster's General Manager.

145.    The Employment Agreement provided at paragraph 1 that:

> for a period of six (6) months from the effective date, [Live Lobster] may
> terminate this contract and [Brown's] employment hereunder, without cause and at
> any time, upon fourteen (14) days written notice. . . . Thereafter, the Employment
> of [Brown] may be terminated by [Live Lobster] for cause (i.e. theft,
> embezzlement, insubordination, fraud, misrepresentation, or the like).

146.    Brown fully performed his duties pursuant to the Employment Agreement.

147.    Live Lobster, through Bussone and, upon information and belief, with the consent

of Verrini, terminated Brown's employment without Cause in September 2009.

148.    Live Lobster's, Bussone's and Verrini's without cause termination of Brown's

employment constituted a breach of the employment agreement between Live Lobster and Brown.

149.    As a result of this breach of contract, Brown has been damaged in an amount to be

determined at trial.

**Count II**

**Breach of Contract**
**Boston Lobster, Kennebunk Lobster, Atlantic Lobster, Knox Lobster, Phippsburg Lobster, Rockland Lobster, Lobster Web, Stonington Real Estate, Bait Man, Perishable Packaging and New England Lobster**
**Tax Liability and Equalization Payments**

150.    Brown restates and incorporates herein by reference paragraphs 1 through 149.

151.    Brown entered into Operating Agreements, Exhibit 2, with eleven of the defendant Limited Liability Companies: Boston Lobster, Kennebunk Lobster, Atlantic Lobster, Knox Lobster, Phippsburg Lobster, Rockland Lobster, Lobster Web, Stonington Real Estate, Bait Man, Perishable Packaging and New England Lobster.

152.    The Operating Agreements of each of these entities provide at Section 4.2(b) that the LLC shall

pay the tax liability of the member's distributive share of income of the Company no later than seventy-five (75) days after the end of the taxable year unless otherwise determined by the affirmative vote of Members holding a majority of the percentages then held by Members.

153.    In addition to paying the income tax liability for a member's distributive share of income, the practice of Brown, Bussone and Verrini was and is to make additional distributions to the Members to "equalize" the tax benefit received by the Member with the highest tax burden – usually Bussone.

154.    In 2008 Brown received a tax equalization distribution of $35,006 and Verrini, upon information and belief, received a tax equalization distribution of $13,146.

155.    Just prior to Brown's wrongful termination, the Companies' accountants estimated that the tax payments made by the venture to pay the tax liabilities of the members for calendar year 2009 would be $117,620 for Bussone, $97,680 for Brown and $67,192 for Verrini.  The

accountants estimated that the tax equalization payments for calendar year 2009 would be $19,680 for Brown and $50,428 for Verrini.

156.    Despite numerous demands by Brown and his counsel, Bussone and Verrini have refused to pay Brown's tax liability as required by the Operating Agreements.

157.    Despite the agreement between Brown, Bussone and Verrini, as well as their past practice, Bussone and Verrini have refused to make tax equalization payments to Brown.

158.    The refusal of Boston Lobster, Kennebunk Lobster, Atlantic Lobster, Knox Lobster, Phippsburg Lobster, Rockland Lobster, Lobster Web, Stonington Real Estate, Bait Man, Perishable Packaging and New England Lobster through Bussone and Verrini to pay Brown's tax liability or tax equalization payments constituted a breach of the operating agreements between Brown, Bussone and Verrini.

159.    As a result of this breach of contract, Brown has been damaged in an amount to be determined at trial.

**Count III**
**Breach of Contract**
**Boston Lobster, Kennebunk Lobster, Atlantic Lobster, Knox Lobster, Phippsburg Lobster, Rockland Lobster, Lobster Web, Stonington Real Estate, Bait Man, Perishable Packaging and New England Lobster**
**Capital Proceed Distribution**

160.    Brown restates and incorporates herein by reference paragraphs 1 through 159.

161.    Brown entered into Operating Agreements, Exhibit 2, with eleven of the defendant Limited Liability Companies: Boston Lobster, Kennebunk Lobster, Atlantic Lobster, Knox Lobster, Phippsburg Lobster, Rockland Lobster, Lobster Web, Stonington Real Estate, Bait Man, Perishable Packaging and New England Lobster.

162.    The Operating Agreements of each of these entities provide at Section 4.4(c) that the LLC shall distribute Capital Proceeds, after certain payments and deductions and after accounting for adjustments to capital accounts, õto the Members in proportion to their [ownership] Percentages.ö

163.    Despite numerous demands by Brown and his counsel, Boston Lobster, Kennebunk Lobster, Atlantic Lobster, Knox Lobster, Phippsburg Lobster, Rockland Lobster, Lobster Web, Stonington Real Estate, Bait Man, Perishable Packaging and New England Lobster, through Bussone and Verrini, have refused to pay Capital Proceeds to Brown.

164.    As a result of this breach of contract, Brown has been damaged in an amount to be determined at trial.

**Count IV**
**Breach of Implied Covenant of Good Faith and Fair Dealing**
**Live Lobster, Boston Lobster, Kennebunk Lobster, Atlantic Lobster, Knox Lobster,**
**Phippsburg Lobster, Rockland Lobster, Lobster Web, Stonington Real Estate, Bait Man,**
**Perishable Packaging and New England Lobster**

165.    Brown restates and incorporates herein by reference paragraphs 1 through 164.

166.    Live Lobster, through Bussone and Verrini, failed and refused to abide by its agreement and obligation to continue to employ Brown unless terminated for Cause, as defined in the employment agreement between Brown and Live Lobster.

167.    Boston Lobster, Kennebunk Lobster, Atlantic Lobster, Knox Lobster, Phippsburg Lobster, Rockland Lobster, Lobster Web, Stonington Real Estate, Bait Man, Perishable Packaging and New England Lobster, through Bussone and Verrini, have refused to pay tax liability, tax equalization payments or Capital Proceeds to Brown.

168.    The conduct by Live Lobster, Boston Lobster, Kennebunk Lobster, Atlantic Lobster, Knox Lobster, Phippsburg Lobster, Rockland Lobster, Lobster Web, Stonington Real

Estate, Bait Man, Perishable Packaging and New England Lobster, Bussone and Verrini in

terminating Brown without Cause, depriving Brown of salary and other compensation for the

professional services he provided to Live Lobster, the failure or refusal to pay tax liability, tax

equalization payments or Capital Proceeds to Brown  is a breach of the implied covenant of good

faith and fair dealing inherent in their agreements.

169.    As a result of this breach of the implied covenant of good faith and fair dealing,

Brown has been damaged in an amount to be determined at trial.

**COUNT V**
**<u>Promissory Estoppel</u>**
**Live Lobster, Boston Lobster, Kennebunk Lobster, Atlantic Lobster, Knox Lobster,**
**Phippsburg Lobster, Rockland Lobster, Lobster Web, Stonington Real Estate, Bait Man,**
**Perishable Packaging and New England Lobster**

170.    Brown restates and incorporates herein by reference paragraphs 1 through 169.

171.    Live Lobster, through Bussone and Verrini, induced Brown by their promises to

employ him unless and until Cause existed to terminate him, to become General Manager of Live

Lobster.

172.     Boston Lobster, Kennebunk Lobster, Atlantic Lobster, Knox Lobster, Phippsburg

Lobster, Rockland Lobster, Lobster Web, Stonington Real Estate, Bait Man, Perishable

Packaging and New England Lobster, through Bussone and Verrini, induced Brown by their

promises to pay tax liability, tax equalization payments and Capital Proceeds to Brown, induced

him to become their General manager.

173.     Through these promises, Live Lobster, Boston Lobster, Kennebunk Lobster,

Atlantic Lobster, Knox Lobster, Phippsburg Lobster, Rockland Lobster, Lobster Web, Stonington

Real Estate, Bait Man, Perishable Packaging and New England Lobster, through Bussone and

30

Verrini, induced Brown to labor intensively and exclusively on behalf of Live Lobster and its affiliates from 2003 through September 2009.

174.    Brown, in reasonable reliance on these inducements, continued to work for Live Lobster and its affiliates through September 2009, forsaking all other employment.

175.    Live Lobster, Boston Lobster, Kennebunk Lobster, Atlantic Lobster, Knox Lobster, Phippsburg Lobster, Rockland Lobster, Lobster Web, Stonington Real Estate, Bait Man, Perishable Packaging and New England Lobster, Bussone and Verrini, are estopped from denying their representations and promises, including the promise to employ Mr. Brown until his termination for Cause and to pay tax liability, tax equalization payments and Capital Proceeds to Brown.

176.    As a result the inducements of Live Lobster, Boston Lobster, Kennebunk Lobster, Atlantic Lobster, Knox Lobster, Phippsburg Lobster, Rockland Lobster, Lobster Web, Stonington Real Estate, Bait Man, Perishable Packaging and New England Lobster, Bussone and Verrini and Brown's reasonable reliance thereon, Brown has been damaged in an amount to be determined at trial.

**COUNT VI**
**Unjust Enrichment**
**All Defendants**

177.    Brown restates and incorporates herein by reference paragraphs 1 through 176.

178.    Brown, as the Companies' employee and owner, earned or was otherwise entitled to compensation due and owing to him as well as tax liability payments, tax equalization payments and Capital Proceeds.

179.    Brown has a right to this compensation.

180.    Upon information and belief, the Defendants, possess all of the funds owed to Brown and to which they have no right of possession.

181.    It is unjust for the Defendants to retain these funds or the benefit of these funds.

182.    Brown has suffered damages as a direct and proximate result of the Defendantsø unjust possession of their funds in an amount to be determined at trial.

### COUNT VII
### Breach of Fiduciary Duty – Freeze Out
### Massachusetts Common Law and Maine Common and Statutory Law
### Bussone and Verrini

183.    Brown restates and incorporates herein by reference paragraphs 1 through 182.

184.    As co-owners of the corporate defendant closely held corporations and limited liability corporations with Brown, Bussone and Verrini owed Brown a fiduciary duty of utmost good faith and loyalty.

185.    Pursuant to the laws of the State of Maine, both common law and statutory law, particularly 13 Maine Revised Statutes Annotated §§ 743, 831, 832 and 843, Bussone and Verrini are officers and/or directors or de facto directors of the Maine corporations.  As such they owe fiduciary duties of care and loyalty to Brown.

186.    Under both Massachusetts and Maine law these duties included and include, among other things, obligations to: 1) act with the utmost good faith and loyalty, and in a manner that he reasonably believed to be in the best interests of the Companies and their shareholders; 2) refraining from securing private advantage at the expense of the Companies and their shareholders; 3) refraining from participating in transactions where loyalties are divided or where the fiduciary receives a personal financial benefit at the expense of or not equally shared by the shareholders of the Companies; 4) refraining from unjustly enriching themselves at the expense of

or to the detriment Brown; and 5) otherwise refraining from denying Brown the fruits of his status as a shareholder in the Companies.

187.     Bussone and Verrini breached their fiduciary duties by, among other things, terminating Brown as General Manager of the Companies without legitimate business justification for doing so.

188.     Bussone and Verrini breached those fiduciary duties by, among other things, terminating Brown as General Manager of the Companies and by failing to engage in a course of conduct less harmful to Brown's interests.

189.     By their "freeze out" actions, Bussone and Verrini have purposely deprived Brown of the sole benefit he received from his minority ownership of the Companies.

190.     As a result of their actions, Bussone and Verrini have materially profited to Brown's detriment and Brown has no remaining prospect for return on his investment in the Companies.

191.     As a result of Bussone and Verrini's actions Brown has suffered and continues to suffer damages including but not limited to his ownership interest in the value of the Companies; the value of foregone opportunities; the value of his contributions of resources, time and effort into the Companies; and the consequential damages flowing from the above, plus interest and costs, including his attorneys' fees incurred in obtaining recovery from Bussone and Verrini.

192.     Brown has suffered damages as a direct and proximate result of Bussone's and Verrini's breach of their fiduciary duties in an amount to be determined at trial.

## COUNT VIII
### Breach of Fiduciary Duty – Tax and Capital Payments
**Bussone and Verrini**

193.     Brown restates and incorporates herein by reference paragraphs 1 through 192.

194.     As co-owners of the corporate defendant closely held corporations and limited liability corporations with Brown, Bussone and Verrini owed Brown a fiduciary duty of utmost good faith and loyalty.

195.     Pursuant to the laws of the State of Maine, both common law and statutory law, particularly 13 Maine Revised Statutes Annotated §§ 743, 831, 832 and 843, Bussone and Verrini are officers and/or directors or de facto directors of the Maine corporations.  As such they owe fiduciary duties of care and loyalty to Brown.

196.     Bussone and Verrini breached their fiduciary duties by, among other things, refusing to pay tax liability, tax equalization payments and Capital Proceeds to Brown.

197.     By their actions, Bussone and Verrini have purposely deprived Brown of payments he previously received and/or to which he is entitled as a result of his minority ownership of the Companies.

198.     As a result of their actions, Bussone and Verrini have materially profited to Brown's detriment and Brown has no remaining prospect for return on his investment in the Companies.

199.     Brown has suffered damages as a direct and proximate result of the Bussone and Verrini's breach of their fiduciary duties in an amount to be determined at trial.

**COUNT IX**
**Breach of Fiduciary Duty – Waste**
**Bussone and Verrini**

200.    Brown restates and incorporates herein by reference paragraphs 1 through 199.

201.    As co-owners of the corporate defendant closely held corporations and limited liability corporations with Brown, Bussone and Verrini owed Brown a fiduciary duty of utmost good faith and loyalty.

202.    Pursuant to the laws of the State of Maine, both common law and statutory law, particularly 13 Maine Revised Statutes Annotated §§ 743, 831, 832 and 843, Bussone and Verrini are officers and/or directors or de facto directors of the Maine corporations.  As such they owe fiduciary duties of care and loyalty to Brown.

203.    Bussone and Verrini have breached their duties by engaging in acts of corporate waste and by exposing Brown to substantial and unwarranted liability.

204.    Bussone's and Verrini's wrongful acts include the mismanagement of the Companies; misusing corporate assets and overspending on purchases and ventures; failing to take all steps necessary to limit Brown's financial exposure including cancelling credit cards issued using his name and social security number and working to eliminate Brown's personal guaranty of over $6,000,000 in corporate debt to TD Bank; inviting Brown to a false purported "shareholders' meeting"; and, providing false information to TD Bank and government authorities.

205.    As a result of the breaches of fiduciary duties by Bussone and Verrini, Brown has suffered and continues to suffer damages including, but not limited to: the value of his ownership stake in the Companies; the value of his extensive efforts on behalf of the Companies; the value of

forgone opportunities; and out-of-pocket and consequential damages flowing from the above, including attorneysøfees, costs and expenses.

206.     Brown has suffered damages as a direct and proximate result of the Bussone and Verriniøs breach of their fiduciary duties in an amount to be determined at trial.

## COUNT X
## Action for Accounting
## All Defendants

207.     Brown restates and incorporates herein by reference paragraphs 1 through 206.

208.     Brown, Bussone and Verrini are all owners of closely held corporations in which all three owe a fiduciary duty to the companies and to each other.

209.     Brown has been wrongfully frozen out of the Companies by the actions and omissions of Bussone and Verrini.

210.     Brown respectfully requests that this Court order Bussone and Verrini to make a full and complete accounting of each of the Companies and to preserve the status quo of the assets of and revenues from the Companies to which Brown is entitled.

## COUNT XI
## Accounting and Inspection of Records
## All Defendants

211.     Brown restates and incorporates herein by reference paragraphs 1 through 210.

212.     As a shareholder of the Companies, Brown has a right to inspect the books and records of the Companies pursuant to Massachusetts common and statutory law (particularly M.G.L. c. 156D) and Maine common and statutory law (particularly 13 M.R.S.A. § 1604).

213.     Bussone has wrongfully prevented Brown from proper access to the corporate records which he is entitled to inspect.

214.     Accordingly, Brown hereby requests this Court to order Bussone to provide full access to the Companies' records and to order any other relief it deems just and proper.

## COUNT XII
## M.G.L. c. 93A
## All Defendants

215.     Brown restates and incorporates herein by reference paragraphs 1 through 214.

216.     The Defendants were and are engaged in trade and commerce in Massachusetts.

217.     Defendants have engaged in deceptive acts and practices in violation of M.G.L. c. 93A by, among other things, breaching their fiduciary and other duties to Brown and engaging in other wrongful conduct as set forth above.

218.     As a result of Defendants' actions, Brown has suffered, and continues to suffer damages.

## COUNT XIII
## Declaratory Judgment
## Bussone and Verrini

219.     Brown restates and incorporates herein by reference paragraphs 1 through 218.

220.     Pursuant to the federal Declaratory Judgment Act 28 U.S.C.A § 2201 this court has the authority to declare the rights and legal obligations of the parties.

221.     Pursuant to this power, Brown requests this Court to declare that Bussone and Verrini have breached their fiduciary duties owed to Brown; that their wrongful actions denied Brown the benefits of his ownership of the Companies; that Bussone and Verrini wrongfully received benefits from the Companies to which they were not entitled; that their actions cause damage to Brown.

## COUNT XIV
## Equitable Disgorgement
### Bussone and Verrini

222.    Brown restates and incorporates herein by reference paragraphs 1 through 221.

223.    Bussone and Verrini have engaged in various breaches of fiduciary duty, corporate mismanagement and corporate waste, all of which have caused substantial harm to Brown.

224.    Bussone and Verrini's actions commenced at least at the time of Brown's illegal termination.

225.    Bussone's and Verrini's acts are of a nature requiring the Court to utilize its equitable powers to remedy these wrongs.

226.    Pursuant to this power, Brown requests this Court to order, among other things, that Bussone and Verrini be disgorged of all revenue, pay, profit or other remuneration received from the Companies since the time of Brown's termination.

227.    Pursuant to this power, Brown also requests this Court to order that Bussone and Verrini be made to repay to the corporation any and all monies paid by the Companies to legal counsel relating to the termination of Brown or paid to legal counsel since the termination of Brown.

228.    Finally, Brown requests that this Court enter an order enjoining Bussone or Verrini from using any money or assets of the company to pay for the defense of this litigation but to require each to pay the same personally and with no indemnification or reimbursement from the Companies.

WHEREFORE, the Plaintiff, Alan Brown, prays and requests the following:

A.      Enter judgment in favor of Brown and against all defendants in an amount not less than all direct, consequential and incidental damages suffered by Brown as alleged in Counts I through XIV.

B.      Order such preliminary injunctive and equitable relief in order to preserve the status quo and protect the assets, earnings and profits of the Companies pending a final adjudication of this lawsuit;

C.      Upon a final adjudication in this matter, order such permanent injunctive and equitable relief and declaratory judgment in favor of Brown as is just and proper;

D.      Award Brown multiple damages suffered as a result of the Defendants' actions pursuant to M.G.L. c. 93A;

E.      Award Brown his costs and expenses incurred in this action including his reasonable attorneys' fees pursuant to M.G.L. c. 93A; and

F.      Award such other relief as this court deems just and proper.


**ALAN BROWN DEMANDS A TRIAL BY JURY ON ALL CLAIMS SO TRIABLE.**

## <u>VERIFICATION</u>

I, Alan Brown, on oath and under the pains and penalties of perjury, state that I have read the Verified Complaint and Jury Demand and that the facts set forth therein are true based on my own present knowledge or based upon my review of relevant documents, and as to all matters alleged upon information and belief, I believe them to be true.

<u>      /S/ Alan Brown               </u>
Alan Brown

Respectfully submitted,

Alan Brown,

By his attorneys,

<u>      /S/ John F. Tocci               </u>
John F. Tocci, Esq., BBO# 562139
Cary P. Gianoulis, Esq., BBO# 649900
Tocci, Goss & Lee, P.C.
35 India Street, 5th Floor
Boston, Massachusetts 02110
(617) 542-6200

jtocci@lawtgl.com
cgianoulis@lawtgl.com

Dated: June 21, 2010